NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

KA 24-560

STATE OF LOUISIANA

VERSUS

DESMOND DEONDRE SCARBOROUGH

**********

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 357,699
HONORABLE LOWELL C. HAZEL, DISTRICT JUDGE

**********

LEDRICKA J. THIERRY
JUDGE

**********

Court composed of Charles G. Fitzgerald, Ledricka J. Thierry, and Wilbur L. Stiles, Judges.

AFFIRMED.

**J. Phillip Terrell, Jr., District Attorney**
**Kelvin G. Sanders, Assistant District Attorney**
**Ninth Judicial District**
**Parish of Rapides**
**P.O. Box 7358**
**Alexandria, LA 71306-7358**
**(318) 473-6650**
**COUNSEL FOR APPELLEE:**
      **State of Louisiana**

**Peggy J. Sullivan**
**Louisiana Appellate Project**
**P.O. Box 1481**
**Monroe, LA 71210-1481**
**(318) 855-6038**
**COUNSEL FOR DEFENDANT/APPELLANT:**
      **Desmond Deondre Scarborough**

**THIERRY, Judge.**

Defendant appeals his convictions and sentences on two counts of aggravated assault with a firearm. For the following reasons, we affirm Defendant's convictions and sentences.

**FACTS AND PROCEDURAL HISTORY**

Defendant, Desmond Deondre Scarborough, picked up Celena Neal, who he was dating, after her work shift at a Love's gas station in Rapides Parish. Defendant had his five-year-old son, D.J., in the car with him. It was alleged that Defendant and Ms. Neal began arguing, which became physical. Defendant then drove off to an isolated area. At that point, Ms. Neal alleged Defendant threw her to the ground and kicked her in the stomach, with knowledge that she was pregnant. Defendant then fired a gun several times in the air and once near Ms. Neal's feet. Ms. Neal was able to escape and drove off with D.J. in the vehicle. Ms. Neal then drove to a gas station where she saw a police officer. Eventually, both Ms. Neal and D.J. spoke with police, who then investigated the incident, leading to Defendant's arrest.

Defendant was originally charged by bill of information with domestic abuse battery – strangulation, a violation of La.R.S. 14:35.3; two counts of aggravated assault with a firearm, violations of La.R.S. 14:37.4; illegal use of a weapon or dangerous instrumentality, a violation of La.R.S. 14:94(E); and aggravated criminal damage to property, a violation of La.R.S. 14:55. The State proceeded to trial on two counts of aggravated assault with a firearm, and the remaining charges were dismissed. Defendant was convicted as charged on both counts and sentenced to seven years at hard labor on each count, to run concurrently. This appeal followed, wherein Defendant asserts the following assignments of error:

1. The evidence was insufficient to prove Defendant guilty of aggravated assault with a firearm;

2. The trial court erred in not allowing Defendant to represent himself;

3. The trial court erred in imposing an excessive sentence.

## ANALYSIS

### I. *Sufficiency of the Evidence.*

Defendant first contends the victim's testimony, which contradicted his, was not sufficient to support his conviction of two counts of aggravated assault with a firearm. The State disagrees, arguing that the jury resolved its credibility determination in favor of the victim, and sufficient evidence was presented to uphold Defendant's conviction.

The analysis for a claim of insufficient evidence is well-settled:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State ex rel. Graffagnino v. King,* 436 So.2d 559 (La.1983); *State v. Duncan,* 420 So.2d 1105 (La.1982); *State v. Moody,* 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibilities of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the trier of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See Graffagnino,* 436 So.2d at 563, *citing State v. Richardson,* 425 So.2d 1228 (La.1983).

*State v. Freeman,* 01–997, p. 3 (La.App. 3 Cir. 12/12/01), 801 So.2d 578, 580.

Furthermore:

> In the absence of internal contradiction or irreconcilable conflicts with physical evidence, the testimony of one witness, if believed by the trier of fact, is sufficient to support a conviction. *State v. Johnson,* 00–1552 (La.App.

> 5 Cir. 3/28/01) 783 So.2d 520, 527, *writ denied,* 01–1190 (La.3/22/02), 811 So.2d 921. The question of the credibility of the witnesses is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness. *Id.* The credibility of the witnesses will not be re-weighed on appeal. *Id.*

*State v. Dixon,* 04–1019, p. 12 (La.App. 5 Cir. 3/15/05), 900 So.2d 929, 936.

*State v. Perry*, 08-1304, pp. 1–2 (La.App. 3 Cir. 5/6/09), 9 So.3d 342, 344, *writ denied*, 09-1955 (La. 6/25/10), 38 So.3d 352.

Louisiana Revised Statutes 14:37.4 provides in pertinent part:

> A. Aggravated assault with a firearm is an assault committed with a firearm.
>
> B. For the purposes of this Section, "firearm" is defined as an instrument used in the propulsion of shot, shell, or bullets by the action of gunpowder exploded within it.

Assault is defined in La.R.S. 14:36 as "an attempt to commit a battery, or the intentional placing of another in reasonable apprehension of receiving a battery." Louisiana Revised Statutes 14:33 defines battery in pertinent part as "the intentional use of force or violence upon the person of another."

At trial, Ms. Neal testified that she was dating Defendant on the day of the incident. She was employed at a Love's gas station, and Defendant and his son, D.J., picked her up from work around 9:00 p.m. in Ms. Neal's vehicle. Ms. Neal testified she walked out to the car with a bag of Skittles candy that Defendant had asked her to buy. Ms. Neal testified as she was walking out of the Love's gas station, she received a phone call from her cousin, Alaya Hawkins. Ms. Neal spoke to Ms. Hawkins on the phone in front of Defendant. He got upset with Ms. Neal because her cousin had asked her to go out for drinks, and Ms. Neal was pregnant. Ms. Neal

3

testified that she told Defendant she was not planning to meet her cousin for drinks, and she was going to tell her about the pregnancy.

Defendant got mad at Ms. Neal and threw the bag of Skittles, hitting her in the face. Ms. Neal testified that she "took two fingers and [she] just shoved his head just like that and [she] said, boy whatever." Defendant got upset, jumped on top of her, "scarring [her] eyes out."

Ms. Neal added:

> When he started scratching my eyes out he knocked my rear view mirror down trying to sit on top of me like that. When he got on top of me he sat on me and he was sitting like this and his legs were still over here in a way but he managed to put one foot over there and he hit - - for the gas.

According to Ms. Neal, Defendant sped off and "almost hit like three or four other drivers" as they were leaving the Love's parking lot. Ms. Neal testified that she could not see "because . . . the way he scratched [her] eyes everything was blurry."

Upon stopping, Defendant exited the car on the driver's side, and Ms. Neal was "still under him." He then took Ms. Neal's phone and got out of the car. Defendant smashed the phone into "bits and pieces" on the road, grabbed Ms. Neal by the hair, slammed her to the ground, punched and slapped her, and kicked her in her stomach knowing she was pregnant with his child. Defendant pointed the gun at Ms. Neal and told her to "get the F up." As he was doing this, D.J. stepped in front of Ms. Neal. According to Ms. Neal, D.J. said, "no daddy I like CC," and Defendant told him to "get the F in the car." D.J. started to cry, and Defendant got frustrated. Ms. Neal testified that Defendant then "started to scream and yell and he started shooting the gun a few rounds but not towards us at this second." Defendant then pointed the gun back at Ms. Neal and told her to get up. As she crawled toward

4

D.J., Defendant shot the gun toward the ground to make her hurry. D.J. tried to help Ms. Neal get up, but Defendant went over and grabbed her by her hair and neck and threw her into the car. Once in the car, Defendant screamed at Ms. Neal, telling her "how this and that about me." She testified that he also hit her in the face a few times. Ms. Neal testified that she cried, screamed, and began to pray. She said Defendant looked at her and said, "the devil sent me God is not here to save you now."

Defendant drove off recklessly, yelling at Ms. Neal and hitting her a few times. During this time, she took Defendant's phone, hid it next to her, and then threw it out of the car. Ms. Neal testified that Defendant took her to a hotel across from a gas station where he further attempted to find his phone but was unsuccessful. At this point, Ms. Neal contemplated escape:

> A    He told me to get back in the car. He looked at me and noticed that I - - something in me wanted to run and he had that gun he told me to get in the car.
>
> Q    Okay.
>
> A    So, I got in the car.
>
> Q    And after you got in the car, what happened next?
>
> A    He kept hitting me, he just kept yelling at me and telling me that I took his phone and I kept saying, I didn't take your phone because I didn't want him to keep hitting me. I thought it would at least stop by then.

Still searching for his phone, Defendant proceeded back to the road where the first encounter occurred. Defendant exited the car, but because Ms. Neal was scared, she did not. She testified that she jumped to the driver's seat, closed the driver's door, and rolled up the windows. When Defendant heard the driver's door shut, he pointed the gun at Ms. Neal to get her to move out of the driver's seat. She testified

5

that she revved the engine to warn Defendant, and then accelerated, at which point Defendant moved out of the way. Defendant started shooting at the car, which Ms. Neal testified she could hear through the open back window. At this point, D.J. was in the car behind the passenger seat. Ms. Neal drove to a gas station where she encountered a police officer who assisted her. According to Ms. Neal, she was not going to "tell on" Defendant because she did not want him to go to jail. She just wanted to "move on and leave each other alone." However, D.J. told the officer what had occurred that night.

Ms. Neal testified that she found out that after she left Defendant on the road, he had used his tablet to get a ride, and he went looking for them. During his search, Defendant went to Ms. Neal's mother's house with a gun and "was going to shoot [Ms. Neal's] little brother." Ms. Neal testified that after the incident, she refused medical attention, thinking that if she did, everything would be resolved. On re-direct examination, Ms. Neal testified that D.J. was close to five years old at the time of the incident, and he told his dad not to kill her because he loved her.

On cross-examination, Ms. Neal testified that while she was driving away from Defendant, she was able to see him shooting at her in her rearview mirror. She told D.J., "I'm sorry baby I have to go I can't do this." She testified that D.J. cried the whole time and asked her if everything was going to be okay, and she told him it would be. He told her he was scared, and she told him, "it's okay God got us."

Deputy Martin Williams of the Rapides Parish Sheriff's Department testified that when he encountered Ms. Neal, she was very upset and stuttering. Once she calmed down, she told Deputy Williams that when her boyfriend arrived to pick her up from work and saw her standing outside talking on the phone, he began yelling and screaming "saying that she was on the phone with a boyfriend or girlfriend or

6

someone." Ms. Neal said Defendant shoved her in the face and she pushed him back, and the two started struggling. Ms. Neal got into the vehicle thinking they were going home, but instead Defendant sped out of the parking lot, almost hitting a couple of people. The two continued to struggle inside the vehicle, and Defendant swerved the vehicle into a ditch resulting in it coming to an abrupt stop. Ms. Neal slammed her head on the dashboard, and Defendant exited the vehicle, grabbed her, and pulled her out of the vehicle. Defendant then slammed her to the ground and began punching her. He grabbed her by the neck and started strangling her. Ms. Neal was able to grab a cell phone and toss it into the weeds. Defendant released her, and she ran to the vehicle, locked the doors, and drove out of the ditch. As Ms. Neal was driving away, she saw and heard gunshots being fired from a weapon Defendant had pulled from his waistband. Deputy Williams testified that he spoke to D.J. as well, and he corroborated everything Ms. Neal said.

On cross-examination, Deputy Williams testified that he observed damage to the vehicle indicating it had been wrecked. However, due to the victim's confusion regarding the area where the crash occurred, they could not locate the crash site nor any shell casings.

Deputy Jeremy Roberts of the Rapides Parish Sheriff's Office testified that he took photographs of the victim and the vehicle the night of the incident. One photograph of the victim showed scratches on the back of her neck. Another showed scratches on her chin and both of her cheeks.

Detective John Skrobarcek, also of the Rapides Parish Sheriff's Office, testified that he took a statement from the victim approximately three days after the incident. Ms. Neal's statement to Detective Skrobarcek revealed that during her argument with Defendant in the car, he pulled her out of the car and committed a

battery on her. He broke her phone and threw her back into the vehicle. At one point, he choked her and slammed her into the dashboard of the vehicle. Prior to that, when Defendant picked up Ms. Neal, he discharged a firearm near her head, and she said her ears were ringing. When Defendant later returned to the area where he dropped his phone, he battered the victim and again brandished the firearm. At that point, Defendant's son D.J. got between Defendant and Ms. Neal and stopped him from shooting her on the side of the road. Ms. Neal got into the car, locked the doors, and sped off with D.J. in the car as she heard shots being fired by Defendant. According to Detective Skrobarcek, Ms. Neal's statement was consistent with what he saw on the body camera and in her written statement.

On cross-examination, Detective Skrobarcek testified that he never spoke to Defendant, only Ms. Neal. The only evidence he found supporting her accusations was the video that showed her visible injuries on the night of the incident.

Lucille Collins, a forensic interviewer for Project Celebration in Many, Louisiana, was accepted by the court as an expert in her field. On December 27, 2022, she interviewed D.J., who was brought to the center by his mother. The interview was recorded, and the recording was played at trial. On cross-examination, Ms. Collins explained that she is trained to believe what the child says, and it is up to detectives to determine whether the information is truthful or not. As for her interview of D.J., Ms. Collins believed D.J. understood what was going on. D.J. did not mention standing between Defendant and Ms. Neal while Defendant was shooting. D.J. did not mention any shooting, but he did mention a gun when "he put his hand up to his head he mentioned about the gun to his - - to the head." When asked what D.J. said about a car wreck, Ms. Collins initially said that D.J. said that his dad almost turned the car over. However, after the pertinent portion of the

8

video was replayed for her review, she confirmed that D.J. said "CC" was driving the car. Upon review of the video in the record, we found it difficult to understand what D.J. was saying; however, at one point in the interview, D.J. clearly stated his dad hit "CC" and that he broke her phone. He also said the car almost flipped over, and he [D.J.] fell to the ground.

Deputy Frederick Burgess of the Rapides Parish Sheriff's Office testified that he first encountered the victim at a Chevron gas station where he was meeting Deputy Martin. When he asked Ms. Neal what was going on, she told him she needed gas money to get back to Cloutierville. He described her as being nervous, and she tried to hush D.J. when he started talking to Deputy Burgess. Deputy Burgess testified that he told Ms. Neal to let D.J. talk, and he summarized what D.J. said:

> He said, my daddy picked me up - - my momma from work took us down a dark road. The dark road was over there by Bayou Rapides and Robinson Road. And he stated that they were fighting in the field and she threw the cell phone, she had managed to get the car out the field and he shot two times with the gun he had and he said the gun looked just like the one we had on our side.

Once D.J. made these statements to Deputy Burgess, an investigation ensued.

On cross-examination, Deputy Burgess testified that although Ms. Neal initially would not talk, once D.J. began talking, she did as well. Deputy Burgess testified that he noted no inconsistencies in the statements made by the two. While talking to Ms. Neal, Deputy Burgess noticed a bruise on her chin, that her eyes were red, and she had scratch marks around her eyes. Ms. Neal told him that Defendant picked her up at Love's truck stop and drove her to a dark area. They began fighting in a field, and she "tossed the phone." She then got in the driver's side of the car

9

and drove off, and the Defendant shot twice. As she was driving away, she saw some lights which she drove toward, ending up at a Chevron station.

Defendant testified that when he picked up Ms. Neal from work around 11:00 p.m., she was on the phone, and when she hung up, she immediately accused him of having a "young lady" in her car, information she had learned from her mother. When Ms. Neal accused Defendant of cheating, he reminded her they had broken up at the end of March and were just trying to "work on things or whatever." According to Defendant, the two were "not together" at that time.

Defendant was asked what happened as they left Love's. He testified that Ms. Neal attacked him and hit him in the face. He told her to stop, but she persisted in being "toxic" and aggressive, continuing to accuse him of having a girl in her car. Ms. Neal yelled at him to get out of her car, and Defendant threatened to call the police. Defendant denied responding physically, and he denied having or owning a gun.

Defendant testified that he drove toward Natchitoches, and when they were around Chopin, Ms. Neal threw D.J.'s tablet out of the car. Defendant testified that when he pulled over to retrieve the tablet, she struck him with the car and drove toward Cloutierville. Defendant was picked up by a man named Blake Carter who took him to Ms. Neal's mother's house, where he accused Ms. Neal of kidnapping D.J. According to Defendant, Ms. Neal's mother "called the police on [Defendant]" to keep him from reporting her daughter for kidnapping. Defendant was arrested in Natchitoches, but he said the charges were dropped.

On cross-examination, Defendant testified his arrest in Natchitoches was for terrorizing, stalking, resisting an officer, and illegal carrying of weapons. He admitted having a weapon on him at the time of arrest, but he maintained that he did

10

not own a weapon. On redirect examination, Defendant testified that he asked Mr. Carter to take him to his apartment after they left Ms. Neal's mother's house. There, he retrieved a "weapon from my paranoid schizophrenia fear of what just happened to me." He testified that he did not intend to harm anyone, having retrieved the gun only for the protection of himself and his son. On re-cross examination, Defendant explained that he did not own the gun. Rather, it was registered in a family member's name, and Defendant used it for protection.

It is clear the jury rejected Defendant's testimony, and made a credibility determination in favor of the victim, Ms. Neal. The testimony of Ms. Neal alone was sufficient to prove beyond a reasonable doubt that Defendant placed her in reasonable apprehension of receiving a battery while he was armed with and discharged a firearm. Therefore, this assignment of error lacks merit.

## II. *Request for Self Representation.*

In his second assignment of error, Defendant contends the trial court erred in denying his request for self-representation made on January 8, 2024. In open court that day, Defendant requested to represent himself. After informing Defendant that he does not advise people to represent themselves, the trial judge questioned Defendant to determine whether he was capable of self-representation. In response to the court's questions, Defendant said he was thirty years old. He confirmed that he filed a pro se motion for speedy trial in May and was supposed to go to court in June. Before further questioning, the judge said that he was not going to allow Defendant to represent himself. Defendant said he would "love to represent [himself]," because he did not trust any public defenders. The court continued its questioning, learning that Defendant completed ninth grade, could read and write the English language, and understood he had a right to counsel even if he could not

11

afford one. When asked about his mental health, Defendant indicated that he had over fifteen mental illness diagnoses, including "paranoia schizophrenia" and other things he could not pronounce without his paperwork in front of him. He said he received disability as a result of some of his diagnoses. The court asked whether Defendant was on medication for his condition, and Defendant said that he asked for his medications, but the jail had not given them to him. The judge then listed Defendant's charges, which were domestic abuse strangulation, aggravated assault with a firearm, illegal use of a weapon, and aggravated criminal damage to property. Defendant indicated this did not sound right because "the Judge relieved [him] of the domestic strangulation because there was no probable case in the preliminary hearing," and he should only be facing three charges. The judge informed Defendant that he was in fact charged with the listed offenses, and the judge ended the hearing being satisfied that Defendant was not capable of representing himself, especially considering he did not know the offenses with which he was charged. The following exchange ensued:

BY DEFENDANT:

I do know the charges, Your Honor.

BY THE COURT:

I just asked you and you told me no . .

BY DEFENDANT:

No . .

BY THE COURT:

. . and I asked the Clerk and he looked at the Bill of Information, that's what you're being charged with, sir, just what I read to you.

BY DEFENDANT:

12

> I can show you the paperwork that what I'm saying is - - let's get a correct understanding, what I'm saying is, when I went to my preliminary hearing Judge Doggett relieved me of those charges. That's why my bond went to 56,000, Your Honor.

BY THE COURT:

> You're talking about two different things, sir. The institutionalize - - the institutionalization of the charges . .

BY DEFENDANT:

> I was charged -- okay, yeah.

BY THE COURT:

> . . that's what Mr. Sanders does. So, Judge Doggett nor I, Judge Hazel, we do not have the ability to relieve a charge. Now, we can relieve you of your . .

BY DEFENDANT:

> Bond obligation.

The judge stated that he was "convinced though that I don't think that you have the ability to represent yourself, sir." Thus, he ordered defense counsel to handle the case.

At a subsequent hearing held March 4, 2024, on pro se motions in limine and to suppress, defense counsel indicated that the only pro se motion he might adopt was the pro se motion to suppress, but he would file his own motion. The court explained to Defendant that it did not have to consider pro se motions when a defendant is represented, and entertaining the motion would lead to confusion at trial. It then advised Defendant, "[B]asically, what it comes to, you have a right to be represented, right, but you don't have the right to be represented and representative at the same time." After expressing frustration over being held in jail as an innocent man, Defendant again requested to represent himself. Defendant persisted in complaining about delays, and the State explained to the court that when

13

it was previously present and ready for trial, Defendant made allegations against his previous attorney. At this point, Defendant said, "It's corrupt, y'all are corrupt." The judge warned Defendant, "You're talking about wanting to go to trial and so - - so, when you have the trial so you can't speak out like this."

On April 15, 2024, defense counsel adopted Defendant's motion in limine. At the hearing, when defense counsel presented argument, Defendant interjected, and the court reminded him, "You don't have a right to be representative and represented, right? You can't be your lawyer and then be a defendant too with a lawyer." Defendant pointed out to the court that he had asked to represent himself, to which the court responded, "no." Defendant noted he had done "plenty of case work" and understood his charges. He added:

BY DEFENDANT:

> It was a misunderstanding when I had told you the charges that I was charged with. I said, you didn't let me finish, you cut me off immediately. You was [sic] like, well you don't know what you're charged with this is what you're charged with. I was trying to tell you, Your Honor, that Judge Doggett relieved me of the bond obligation and said no probable cause. I'm fixing to tell you all the charges but when I said that you cut me off, I mean, I study this case every day and I know every charge I'm charged with.
>
> . . . .

BY THE COURT:

> It appears to me in criminal docket number 357,699 . .

BY DEFENDANT:

> And I would like to represent myself if possible.

BY THE COURT:

> . . you're being charged with domestic abuse strangulation, aggravated assault with a firearm two counts of that, illegal use of a weapon one count and then

14

criminal damage to property - - aggravated criminal damage . .

BY DEFENDANT:

Your Honor, I have a paper saying it was no probable cause and count 1 and 3 was dismissed or probable - - bond relief obligation or whatever.

. . . .

BY DEFENDANT:

Let me ask you this, Your Honor, my attorney if he file the motions, will you adopt those, Your Honor, if he file them on his own? Because the last court date we had on March 4th he said he was going to file those motions on his own that he wasn't adopting my motions that he would do it on his own.

Defense counsel then said he had told Defendant that he was adopting only the motion in limine, though Defendant attempted to correct him to say it was the suppression motion. Regardless, through further discussion, Defendant indicated that he understood there was no need for the motion because the court explained to him that "there's no one talking about - - and [sic] hearsay unless it's - - unless there's some reason for hearsay to come in and it's not coming in."

Subsequently, during jury selection, Defendant told the judge, "Excuse me, Your Honor. I wanted to at least pick like 3 or 4 on this one and 3 or 2 on the other - - on the other jury."  The judge reminded Defendant that they had held a hearing regarding self-representation, and it was not a good idea.

The State argues that Defendant's level of education, his mental illnesses, his lack of medication, and his lack of understanding of what he was being prosecuted for or the impact of pre-trial rulings by the trial court show that his attempted waiver

15

was not in his best interest. Thus, the State contends the trial court properly denied Defendant's request.

In *State v. Santos*, 99-1897, pp. 1–5 (La. 9/15/00), 770 So.2d 319, 320–22 (seventh alteration added), the supreme court found the trial court erred in denying the defendant's right to self-representation:

> Affirming relator's conviction and sentence for possession of heroin in violation of La.R.S. 40:966(C)(1), the court of appeal found no error in the trial court's denial of relator's motion to discharge his court-appointed counsel and to represent himself because relator "appeared incompetent to serve as his own counsel in that he did not understand how to proceed on important aspects of his case." *State v. Santos,* 97-1893, p. 8 (La.App. 4th Cir. 5/19/99), 744 So.2d 241 (unpub'd). In a colloquy intended to impress upon relator the dangers of self-representation, the trial court established for the record that relator had only the most rudimentary knowledge of how to summon a witness to court on his behalf, little or no idea how to protect his interests in a pending writ application filed by his appointed counsel in the court of appeal challenging the denial of his motion to suppress the evidence, and no knowledge about the use of peremptory and cause challenges in the selection of a jury. The trial court found that relator did not "have access to the legal training, experience, as well as the research that would be necessary to prepare for a trial in this matter," and denied his motion for self-representation on that basis.
>
> The concern of the trial court and the court of appeal for the impact relator's lack of legal training might have had on the fairness of the proceeding reflects longstanding misgivings about the probable consequences of self-representation. Even as it recognized the Sixth Amendment right of an accused to waive the assistance of counsel and to represent himself or herself at trial, the Supreme Court acknowledged that "[t]here can be no blinking the fact that the right of an accused to conduct his own defense seems to cut against the grain of this Court's decisions holding that the Constitution requires that no accused can be convicted and imprisoned unless he has been accorded the right to the assistance of counsel. . . . For it is surely true that the basic thesis of those decisions is that the help of a lawyer is essential to assure the defendant a fair trial." *Faretta v. California,* 422 U.S. 806, 832, 95 S.Ct. 2525, 2540, 45 L.Ed.2d 562 (1975) (citations and footnote omitted). These concerns have not diminished over the years. *See Martinez v. Court of Appeal of California,* 528 U.S. 152, 164, 120 S.Ct. 684, 692, 145 L.Ed.2d 597 (2000) (Breyer, J., concurring) (While "judges closer to the firing line have sometimes expressed dismay about the practical consequences of [*Faretta's* ] holding. . . . I have found no empirical research . . . that might help determine whether, in general, the right to

represent oneself furthers, or inhibits, the Constitution's basic guarantee of fairness.").

Nevertheless, despite the potential impact an accused's waiver of counsel may have on the fairness of the proceedings, *Faretta* made clear that the accused's "technical legal knowledge, as such, [is] not relevant to an assessment of his knowing exercise of the right to defend himself." *Faretta,* 422 U.S. at 836, 95 S.Ct. at 2541; *see also Martinez,* 528 U.S. at 165, 120 S.Ct. at 693 (Scalia, J., concurring) ("That asserting the right of self-representation may often, or even usually, work to the defendant's disadvantage is no more remarkable-and no more a basis for withdrawing the right-than is the fact that proceeding without counsel in custodial interrogation, or confessing to the crime, usually works to the defendant's disadvantage. Our system of laws generally presumes that the criminal defendant, after being fully informed, knows his own best interests and does not need them dictated by the State."). A trial judge confronted with an accused's unequivocal request to represent himself need determine only whether the accused is competent to waive counsel and is "voluntarily exercising his informed free will." *Faretta,* 422 U.S. at 835, 95 S.Ct. at 2541. In this context, "the competence that is required of a defendant seeking to waive his right to counsel is the competence to *waive* the right, not the competence to represent himself." *Godinez v. Moran,* 509 U.S. 389, 399, 113 S.Ct. 2680, 2687, 125 L.Ed.2d 321 (1993) (footnote omitted).

In the present case, the trial court and court of appeal therefore erred in assessing relator's competence to waive counsel according to a standard appropriate for measuring the competence of *counsel* against professional norms. *Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984) ("The benchmark for judging any claim of ineffective-ness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."). By written motion and personally in open court, relator made an unequivocal request to discharge his court-appointed counsel and to represent himself. Relator explained to the court that he feared "the Indigent Defender Board is working with the police of St. Bernard Parish to keep me here." He thereby voiced a concern at the heart of the right to self-representation. *Faretta,* 422 U.S. at 826, 95 S.Ct. at 2537 . . . . Relator made his request over a month before trial. *Martinez,* 528 U.S. at 162, 120 S.Ct. at 691 ("[M]ost courts require [a defendant] to [make the request] in a timely manner.") (footnote omitted); *State v. Hegwood,* 345 So.2d 1179, 1182 (La.1977) ("[A] criminal defendant who has acquiesced in the representation of counsel, who for the first time requests to represent himself the morning of trial under circumstances which indicate that the request was a delaying tactic, and who makes no showing at all of any particular reason for his delay in asserting that right has impliedly waived his right to self-representation."). Relator maintained the request despite questioning by the trial judge meant to

impress upon him "the dangers and disadvantages of self-representation." *Faretta,* 422 U.S. at 835, 95 S.Ct. 2541. In turn, relator impressed upon the trial judge his competence to make the decision by stating that he had enjoyed an "A" average during two years of college and that he had no mental or physical problems that might interfere with his understanding of the proceedings, an assertion fully borne out by his colloquy with the court.

In the present case, as in *Faretta,* the record thus affirmatively shows that relator was competent to waive counsel and that, even after the court impressed upon him the uncertainties of his decision, he asserted his right of self-representation unequivocally and under circumstances which precluded a finding that he was simply engaged in dilatory tactics. Other alternatives short of denying relator his Sixth Amendment right to self-representation remained open to the trial court concerned about maintaining the fairness of the proceedings. Although relator specifically requested discharge of his court appointed counsel, the trial court could have assigned the attorney or another attorney as stand-by counsel to aid relator, even over relator's objections, or to resume representation of relator if circumstances required the court to terminate his right of self-representation. *Faretta,* 422 U.S. at 834, n. 46, 95 S.Ct. at 2541; *see McKaskle v. Wiggins,* 465 U.S. 168, 187, 104 S.Ct. 944, 956, 79 L.Ed.2d 122 (1984) (stand-by counsel may participate in the trial as long as he does not "seriously undermin[e the defendant's] appearance before the jury in the status of one representing himself.").

The trial court therefore erred in denying relator his Sixth Amendment right to self-representation and the error is not subject to harmless-error analysis. *Wiggins,* 465 U.S. at 177, n. 8, 104 S.Ct. at 950 ("Since the right of self-representation is a right that when exercised usually increases the likelihood of a trial outcome unfavorable to the defendant, its denial is not amenable to 'harmless error' analysis. The right is either respected or denied; its deprivation cannot be harmless.").

Accordingly, relator's conviction and sentence are reversed and this case is remanded to the district court for all proceedings consistent with the views expressed herein.

We note a key factual distinction between this case and *Santos,* is that the defendant in *Santos* did not suffer from any mental health issues. More similar is the case of *State v. Mingo*, 51,647, pp. 12–16 (La.App. 2 Cir. 9/27/17), 244 So.3d 629, 637–40, *writ denied*, 17-1894 (La. 6/1/18), 243 So.3d 1064 (alterations in original) (footnote omitted), where the defendant therein suffered from mental health

18

issues. In *Mingo*, the appellate court found no merit to the defendant's claim that his right to self-representation was violated:

> Minutes before jury selection began on November 14, 2016, Mingo repeatedly attempted to address the trial court and make oral pro se motions and arguments. The trial court admonished Mingo that he did not represent himself, but had two appointed attorneys as counsel. The trial court advised Mingo's defense counsel to "get your client under control" and advised Mingo that if he desired to have motions made, he should instruct his counsel and let counsel address the court. Mingo responded, "Well if that's the case, Your Honor, with all due respect I would like to withdraw from counsel and represent myself." Initially the motion was denied. However, following a bench conference, court reconvened and a *Faretta* hearing was held.

> The trial court denied Mingo's motion for the following reasons: (1) the last-minute timing of the motion and the belief that it was a delay tactic; (2) Mingo's admitted mental problems, including his past diagnosis of bipolar disorder and his recent treatment for anxiety in jail; (3) Mingo's medication for anxiety was recently stopped; (4) Mingo's limited formal education of 10th grade and GED; and, (5) Mingo's inability to express a meaningful understanding of the charge of second degree murder. After the ruling, Mingo had to be removed from the courtroom and placed in belt restraints due to his disruptive behavior.

> Mingo argues he was denied his right to self-representation and that his responses to questioning indicated his choice was intelligently and voluntarily made. He believes the assertion of his right was clear and unequivocal.

> Amendments VI and XIV of the United States Constitution, as well as Louisiana Constitution Article I, § 13, guarantee the accused in a criminal proceeding the right to assistance of counsel for his defense. *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); *State v. Carpenter*, 390 So.2d 1296 (La. 1980); *State v. Johnson*, 50,234 (La. App. 2 Cir. 11/18/15), 182 So.3d 1039, *writ denied*, 15-2242 (La. 3/24/16), 190 So.3d 1190.

> An accused has the right to choose between the right to counsel and the right to self-representation. Requests which vacillate between self-representation and representation by counsel are equivocal. *State v. Strain*, 585 So.2d 540 (La. 1991); *State v. Johnson, supra.*

> The right to counsel may be waived, but the accused must know of the right and intentionally relinquish it. *Faretta v. California, supra.* A waiver of counsel, in order that an accused may enter into pro se representation, must be clear and unequivocal. *Id.*; *State v. Johnson, supra*. In order to be valid, a waiver of the right to counsel by a

defendant must be made knowingly, understandingly, and intelligently. *State v. Conner*, 49,351 (La. App. 2 Cir. 11/19/14), 152 So.3d 209. Although a defendant need not himself have the skill and experience of a lawyer in order to competently and intelligently choose self-representation, he should be made aware of the dangers and disadvantages of self-representation so that the record will establish that "he knows what he is doing and his choice is made with eyes open." *Faretta, supra*, citing *Adams v. United States*, 317 U.S. 269, 279, 63 S.Ct. 236, 242, 87 L.Ed. 268 (1942). Courts must indulge in every reasonable presumption against a waiver of counsel. *Faretta, supra*; *State v. Johnson, supra.*

Although a defendant should be made aware of the dangers and disadvantages of self-representation, there is no particular formula which must be followed by the trial court in determining whether the defendant has waived his right to counsel. *State v. Carpenter, supra*; *State v. Johnson, supra*. The determination of whether a defendant knowingly and voluntarily waived his right to counsel depends on the facts and circumstances surrounding the case, including the background, experience, and conduct of the accused. *State v. Harper*, 381 So.2d 468 (La. 1980); *State v. Conner, supra.* A more thorough inquiry is required to allow a defendant to represent himself at a felony trial than is required to accept his uncounseled guilty plea to an uncomplicated misdemeanor. *State v. Johnson, supra*. In *State v. Strain, supra*, the Louisiana Supreme Court stated:

> The judge, in accepting a waiver of counsel at trial, should advise the accused of the nature of the charges and the penalty range, should inquire into the accused's age, education and mental condition, and should determine according to the totality of the circumstances whether the accused understands the significance of the waiver.

A jury trial commences when the first prospective juror is called for examination. La. C. Cr. P. art. 761. A defendant who waits until after the commencement of trial to assert for the first time his right to represent himself, after having acquiesced in representation by an attorney through pretrial procedures and the institution of trial, cannot thereafter successfully assert that right unless he makes a showing that the prejudice to his legitimate interests overbalances the potential disruption of the proceeding already in progress. *State v. Hegwood*, 345 So.2d 1179 (La. 1977); *State v. Johnson, supra.*

Once the trial date has arrived, the question of withdrawal of counsel rests with the discretion of the trial court, and the court's ruling will not be disturbed in the absence of a clear showing of an abuse of discretion. *State v. Seiss*, 428 So.2d 444, 447 (La. 1983); *State v. Johnson, supra*. Generally, a defendant's request to represent himself

may be properly denied if the defendant makes such a request for the first time immediately prior to trial. *State v. Hegwood, supra.*

An inappropriate denial of the right to self-representation is not subject to harmless error analysis. Rather, it is a structural error that requires automatic reversal. *McKaskle v. Wiggins*, 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984); *State v. Johnson, supra.*

Mingo's assertion of his right to self-representation was made on the first day of trial, just minutes before the commencement of *voir dire*. The ruling on his motion was within the discretion of the trial court, and the motion was properly denied. In addition to the last-minute timing of the motion, the answers provided by Mingo during the *Faretta* hearing support the denial of his motion. Mingo admitted he experienced mental problems, including bipolar disorder and anxiety. He stated, "I'm having some issues as far as mental goes and me be able to proceed [*sic* ] things . . . I don't know what's happened and I'm not getting—I haven't been to the neurologist yet, but I have an appointment." Mingo also stated he had quit taking his anxiety medications the day before trial.

When asked about his understanding of the nature of the charge of second degree murder, Mingo explained:

> Well second degree murder is—is basically defined as like if—if you had general intent or transfer intent in committing a crime or if you actually had any premed— well it's not premeditation, it's without the thought of premeditativeness I believe.

Mingo understood that the penalty for second degree murder was life imprisonment, without the benefit of probation, parole, or suspension of sentence.

The trial court provided thorough and thoughtful reasoning for denying Mingo's motion for self-representation. The ruling was not an abuse of discretion.

We do note in the present case, Defendant's request to represent himself on January 8, 2025, came before jury selection commenced on May 21, 2024.  Thus, Defendant's request for self-representation was not a dilatory tactic, as was possibly the case in *Mingo*.  However, similarly as in *Mingo*, Defendant stated he suffered from a number of mental health issues for which he was not taking medication at the time of the waiver. Additionally, as in *Mingo*, Defendant had an even more limited

21

formal education of ninth grade. Considering Defendant's mental health issues and lack of education, we cannot say the trial court abused its discretion in finding Defendant's best interests would not have been served by allowing him to waive counsel and represent himself. This assignment of error is without merit.

### III. Excessive Sentence.

In his third assignment of error, Defendant contends his sentences are unconstitutionally harsh and excessive. The penalty range for this offense is a fine of not more than ten thousand dollars or imprisonment for not more than ten years without or without hard labor, or both. La.R.S. 14:37.4. Defendant was sentenced on each count to serve seven years at hard labor, to run concurrently.

At sentencing, it was established Defendant was thirty-one years old, had a tenth or eleventh grade education, had worked in his grandfather's florist business, had formerly worked as a stocker at a Chevron station, and had also been employed at a Wendy's restaurant when he was fifteen years old. At the time of sentencing, Defendant said he owned his own tattoo business and had been in that business since 2016. Defendant informed the court that he "was also going to the trade school for [his] GED as well." Defendant was single with five children, two of whom were born during his incarceration. According to Defendant, in addition to his five children, his mother, sisters, brothers, and other family members relied on him for support.

The trial court inquired as to the existence of any mental health issues, and Defendant told the court that he had over fifteen diagnoses. Being unfamiliar with most of the diagnoses' names, the only two Defendant could recall were "bipolar and schizophrenia." Defendant indicated that he had sought treatment and "got help with counseling."

22

In discussing Defendant's prior criminal history, the trial court stated:

All right. The Court would note Mr. Scarborough's criminal history as the following. He had an arrest in Natchitoches parish in 2012 that was for a possession with intent of CDS I, to wit marijuana, no action was taken on that matter. He was arrested for a felony theft in Natchitoches parish but that was amended to unauthorized use of a movable less than - - he pled guilty to that, less than a thousand. That was on January the 15th of 2015. He was arrested for bank fraud and issuing worthless checks in Natchitoches parish but the State only went after the issuing worthless checks. He pled guilty to 4 counts of issuing worthless checks on January the 15th of 2015. He had a simple burglary that was put in -- Natchitoches parish that put in the pretrial intervention program and that's still open. He had a domestic abuse battery in Natchitoches parish that was in 2017 but no action was taken up from that. He had a misdemeanor theft. It was in Avoyelles parish in 2020. However, he missed court and so there's an outstanding warrant for that. There's an illegal carrying of weapons that he pled guilty to on November the 17th of 2022. That was in Natchitoches parish. Okay. All right. Going over the mitigating and aggravating factors under Louisiana Code of Criminal Procedure Article 894.1, when a defendant has been convicted of a felony or misdemeanor the Court should impose a sentence of imprisonment if any of the following occurs, there is an undue risk that during the period of suspended sentence or probation the defendant will commit another crime, the defendant is in need of correctional treatment or a custodial environment that can be provided most effectively by his commitment to an institution. A lesser sentence would deprecate the seriousness of the defendant's crimes. Further, under Louisiana Code of Criminal Procedure Article 894.1 the following grounds, factors while not controlling shall be accorded weight in the Court's determination of whether a sentence should be suspended or probation imposed. In particular the Court notes the following aggravated factors that the offender's conduct during the commission of the offense manifested deliberate cruelty to the victims

As for mitigating factors, the trial court noted that Defendant had small children who were dependent on him for support. The court also acknowledged defense counsel's comment that the prior convictions were not crimes of violence. Just prior to imposing sentence, the judge stated:

Okay. Sentencing ranges, State v Watson 21-725 Louisiana Appeals Third Circuit April 27, 2022[,] 338 Southern 3rd 95 on November the 26th of 2019 defendant Watson and Lewis were charged, Bill of Information with committing aggravated assault with firearms. They were tried before a 6 person jury on May the 11th of 2021. After an extensive testimony, rigorous analysis of heavy mitigating factors, the

Court determined the following sentence: the Court found the following aggravating factors, the crime manifested -- the crime manifested deliberate cruelty to the victim knowing risk of death or great bodily harm to more than one person, violence in the commission of the offense, the offense resulted in significant injury to the victim, damage to the Hartford's home, use of a dangerous weapon in the commission of the offense and foreseeable endangerment of human life. As a mitigating factor, the Court found the imprisonment for defendants would entail hardship to themselves and to their dependents. The Court found that there was undue risk of the defendants committing other offenses during a period of probation or suspension of sentence. Therefore, the defendants needed correctional confinement. The Court -- trial Court sentenced each to 8 years imprisonment with credit for time served since the date of the offense. The defendants were convicted of crimes of violence, their sentence would not be subject to diminution of good behavior. All right. All right. Based on the evidence submitted, the law and the findings for -- made today, the Court orders that Mr. Desmond Scarborough on the two counts of aggravated assault with a firearm to serve 7 years at hard labor for each count with the Louisiana Department of Corrections to run concurrently.

A motion to reconsider was not filed in this case nor was an oral objection to the sentence made. In *State v. Watson*, 21-725, pp. 10-11 (La.App. 3 Cir. 4/27/22), 338 So.3d 95, 102–03 (alteration in original), this court addressed an excessive sentence claim where there was neither an objection nor a motion to reconsider sentence filed:

> Louisiana Code of Criminal Procedure Article 881.1 provides the mechanism for preserving the review of a sentence on appeal:
>
> > A. (1) In felony cases, within thirty days following the imposition of sentence or within such longer period as the trial court may set at sentence, the state or the defendant may make or file a motion to reconsider sentence.
> >
> > . . . .
> >
> > E. Failure to make or file a motion to reconsider sentence or to include a specific ground upon which a motion to reconsider sentence may be based, including a claim of excessiveness, shall preclude the state or the defendant from raising an objection to the sentence or from urging any ground not raised in the motion on appeal or review.

Thus, a line of jurisprudence would bar Defendants from appealing their sentences. *See State v. Bamburg*, 00-675 (La.App. 3 Cir. 11/2/00), 772 So.2d 356; *State v. Williams*, 01-998 (La.App. 3 Cir. 2/6/02), 815 So.2d 908, *writ denied*, 02-578 (La. 1/31/03), 836 So.2d 59; *State v. Duplantis*, 13-424 (La.App. 3 Cir. 11/27/13), 127 So.3d 143, *writ denied*, 14-283 (La. 9/19/14), 148 So.3d 949.

This court has, however, previously reviewed claims of excessiveness where no motion to reconsider sentence was filed or objection made. In those situations, this court has performed a bare excessiveness review. *State v. Jackson*, 14-9 (La.App. 3 Cir. 6/18/14), 146 So.3d 631, *writ denied*, 14-1544 (La. 2/27/15), 159 So.3d 1066; *State v. Soriano*, 15-1006 (La.App. 3 Cir. 6/1/16), 192 So.3d 899, *writ denied*, 16-1523 (La. 6/5/17), 219 So.3d 1111; *State v. Price*, 16-899 (La.App. 3 Cir. 4/5/17), 216 So.3d 304; *State v. Debarge*, 17-670 (La.App. 3 Cir. 2/7/18), 238 So.3d 491.

In *State v. Soileau*, 13-770, pp. 4–5 (La.App. 3 Cir. 2/12/14), 153 So.3d 1002, 1005–06, *writ denied*, 14-452 (La. 9/26/14), 149 So.3d 261, this court discussed the standard for reviewing claims of constitutional excessiveness:

Sentences within the statutory sentencing range can be reviewed for constitutional excessiveness. *State v. Sepulvado,* 367 So.2d 762 (La.1979). In *State v. Barling,* 00–1241, 00–1591, p. 12 (La.App. 3 Cir. 1/31/01), 779 So.2d 1035, 1042–43, *writ denied,* 01–838 (La.2/1/02), 808 So.2d 331, a panel of this court discussed the review of excessive sentence claims, stating:

La. Const. art. I, § 20 guarantees that, "[n]o law shall subject any person to cruel or unusual punishment." To constitute an excessive sentence, the reviewing court must find the penalty so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals and is, therefore, nothing more than a needless imposition of pain and suffering. *State v. Campbell,* 404 So.2d 1205 (La.1981). The trial court has wide discretion in the imposition of sentence within the statutory limits and such sentence shall not be set aside as excessive absent a manifest abuse of discretion. *State v. Etienne,* 99–192 (La.App. 3 Cir. 10/13/99); 746 So.2d 124, *writ denied,* 00–0165 (La.6/30/00); 765 So.2d 1067. The relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate. *State v. Cook,* 95–2784

(La.5/31/96); 674 So.2d 957, *cert. denied,* 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996).

Further, in reviewing the defendant's sentences, the appellate court should consider the nature of the crime, the nature and background of the offender, and the sentences imposed for similar crimes. *State v. Lisotta,* 98–648 (La.App. 5 Cir. 12/16/98), 726 So.2d 57 (citing *State v. Telsee,* 425 So.2d 1251 (La.1983)), *writ denied,* 99–433 (La.6/25/99), 745 So.2d 1183. In *State v. Smith,* 02–719, p. 4 (La.App. 3 Cir. 2/12/03), 846 So.2d 786, 789, *writ denied,* 03–562 (La.5/30/03), 845 So.2d 1061, a panel of this court observed that:

> While a comparison of sentences imposed for similar crimes may provide some insight, "it is well settled that sentences must be individualized to the particular offender and to the particular offense committed." *State v. Batiste,* 594 So.2d 1 (La.App. 1 Cir.1991). Additionally, it is within the purview of the trial court to particularize the sentence because the trial judge "remains in the best position to assess the aggravating and mitigating circumstances presented by each case." *State v. Cook,* 95–2784 (La.5/31/96); 674 So.2d 957, 958.

In *Watson,* 338 So.3d 95, this court upheld the imposition of eight-year sentences on two defendants where shots were fired out of a car window with one shot hitting the victim in the leg. The trial judge noted the following aggravating factors:

> the crime manifested deliberate cruelty to the victim; knowing risk of death or great bodily harm to more than one person; violence in the commission of the offense; the offense resulted in significant injury to the victim; damage to the Hartfords' home; use of a dangerous weapon in the commission of the offense; and foreseeable endangerment of human life in the offense. As a mitigating factor, the trial court found that imprisonment of the Defendants would entail hardship to themselves or their dependents. The trial court found that there was an undue risk of Defendants committing another offense during any period of probation or suspension of sentence; therefore, Defendants needed correctional confinement.

*Id.* at 99.

This court additionally noted that sentences ranging from five to ten years had been upheld in cases where a weapon was not fired:

In *State v. Lafleur*, 16-467 (La.App. 3 Cir. 1/4/17), 209 So.3d 927, *writ denied*, 17-808 (La. 1/29/18), 235 So.3d 1104, the defendant approached the victim's truck and pointed a rifle at him. The defendant eventually lowered the weapon and walked away. Defendant was sentenced to the maximum sentence of ten years. On appeal, the defendant alleged that the trial court neglected to consider his mental illness as a mitigating factor and that the trial court's sentence was based upon defendant's poor behavior in court rather than the facts of the offense. This court vacated the sentence and remanded for resentencing. After considering defendant's mental health, the trial court resentenced him to ten years at hard labor, with three of those years suspended. The new sentence was affirmed on appeal.

In *State v. Brown*, 17-124 (La.App. 4 Cir. 12/12/17), 234 So.3d 978, *writ denied,* 18-10 (La. 6/15/18), 257 So.3d 678, a check given to the victim by the defendant bounced. When the victim confronted the defendant, the defendant pulled a gun on the victim, placed it against his side, and told the victim he had killed two or three people. The defendant never fired the weapon, and no injuries resulted from the defendant's brandishing of the weapon. However, the fourth circuit affirmed the trial court's imposition of the maximum fine of $10,000 and the mid-range sentence of five years at hard labor.

These cases support the trial court's sentencing in this matter. In neither *Lafleur* nor *Brown* did the defendant fire his weapon at the victim, yet sentences ranging from five years to the maximum were upheld. Defendants herein both fired weapons at Mr. Hartfield.

*Id.* at 104. *See also State v. Boutte*, 24-324 (La.App. 3 Cir. 12/30/24), __ So.3d __ (2024 WL 5244493), where a nine-year sentence was upheld where the defendant punched the victim several times and pulled a gun from his waistband and pointed it in the air before the victim wrestled it away from him.

Reviewing Defendant's claim as a bare claim of excessiveness, we do not find the trial court abused its discretion. The penalty of seven years at hard labor on each count, to run concurrently, is not "so grossly disproportionate to the severity of the crime as to shock [the] sense of justice" nor does it "make[ ] no measurable contribution to acceptable penal goals." *Soileau*, 153 So.3d at 1005. As noted by the trial court, Defendant has a significant criminal history, and he acted with deliberate cruelty to the victim in the presence of Defendant's five-year-old son. In addition to

firing the gun in his assault of Ms. Neal, he also physically hit her numerous times. Additionally, similar sentences imposed for aggravated assault with a firearm have been upheld on appellate review. This assignment of error has no merit.

## IV. Errors Patent.

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find the minutes of sentencing should be corrected to clearly reflect that the trial court imposed a sentence on each count. The minutes of sentencing state the following:

> Court sentenced accused for AGG ASSAULT W/FIREARM. AGG ASSAULT W/FIREARM. Court sentenced accused to be committed to the Louisiana Department of Corrections. Accused to serve 007 Year(s). Sentence is to be served at Hard Labor. Sentence is to run concurrent. Credit for time served. Court designates this as a crime of violence.

Although the minutes state the name of the offense twice (indicating two convictions), the minutes indicate that a single sentence was pronounced. According to the transcript of sentencing, however, the trial court specified that the sentence it pronounced applied to "each count" of aggravated assault with a firearm. "[W]hen the minutes and the transcript conflict, the transcript prevails." *State v. Wommack*, 00-137, p. 4 (La.App. 3 Cir. 6/7/00), 770 So.2d 365, 369, *writ denied*, 00-2051 (La. 9/21/01), 797 So.2d 62. Accordingly, this court will order the trial court to correct the minutes of sentencing to accurately reflect that the trial court imposed the sentences on "each count."

### DECREE

For the foregoing reasons, Defendant's convictions and sentences are affirmed. The trial court is ordered to correct the minutes of sentencing to accurately reflect that the trial court imposed the sentences on "each count."

28

**AFFIRMED.**

This opinion is NOT DESIGNATED FOR PUBLICATION.
Uniform Rules—Courts of Appeal, Rule 2–16.3.